## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

_____

DR. NIKKI ISAACS,

        Plaintiff,

v.                                        No. CIV O3-736 BB/WDS

NEW MEXICO CHILDREN, YOUTH, AND
FAMILIES DEPARTMENT, ET AL.,

        Defendants.

### MEMORANDUM OPINION

       This matter comes before the Court for consideration of Defendants' motion for summary

judgment (Doc. 25).  The Court has reviewed the submissions of the parties and the relevant law,

and, for the reasons set forth below, finds that Defendants' motion will be GRANTED.

       **Standard of Review:**  Summary judgment is appropriate "if the pleadings, depositions,

answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

as a matter of law."  Fed.R.Civ.P.  56(c).  In evaluating a motion for summary judgment, the

court views the evidence and draws all reasonable inferences therefrom in the light most favorable

to the nonmoving  party.  *See Martin v. Kansas*, 190 F. 3d 1120, 1129 (10th Cir. 1999).

However, it is "not required to evaluate every conceivable inference which can be drawn from

evidentiary matter, but only reasonable ones."  *Lucas v. Dover Corp.*, 857 F.2d 1397, 1401 (10th

Cir. 1988).  Summary judgment is inappropriate if disputes remain as to material facts.  *See James

Barlow Family Ltd. Partnership v. David M. Munson, Inc.*, 132 F. 3d 1316, 1319 (10th Cir.

1997).  An issue of fact is "material" if it is essential to the proper disposition of the claim.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In essence, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Id*.

**Facts:**  This case arises out of Plaintiff's former employment with Defendant Children, Youth, and Families Department ("CYFD"), as the superintendent of the State Boys' School. Plaintiff left that position in March 2003, and maintains she suffered a constructive discharge.  A chronology of the significant events in this case, viewed in the light most favorable to Plaintiff, follows.  Plaintiff assumed her position as superintendent on May 21, 2001.  As superintendent, she was provided a house to live in on the grounds of the School.  When she arrived at the School, however, the house was filthy and had not been prepared for her arrival in any way. [Exh. 2, Resp., Pltf. dep. pp. 45-47]  She moved in despite this, and had residents of the School clean the house.  [*Id.*]  At the time she started her job, she was warned by her supervisor, Defendant Hannamann ("Hannamann") that there were at least two employees at the School she should not trust:  Defendant Cruz ("Cruz"), and another executive staff member.  [*Id.*, pp. 47-48] Cruz had been the acting superintendent at the School, and while he was in that position the School lost its accreditation.  [*Id.*, p. 21; Exh. 1, MSJ, Pltf. dep. p. 74]  Plaintiff also heard, from several people around town, that Cruz had boasted of running off two other superintendents, and that Plaintiff would be the next.[1]  [Exh. 2, Resp., p. 45]

Shortly after Plaintiff started her new job, she was also informed for the first time that she would have to supervise three satellite facilities of the School, in Farmington, Portales, and Eagle

---

[1]The Court recognizes this evidence is hearsay and not admissible to prove that Cruz actually made the statements; the Court considers it only as it pertains to Plaintiff's state of mind.

Nest.  If she had known of this requirement prior to accepting the position, she may not have taken the job.  [*Id.* p. 48]  Later, in June 2001, Plaintiff was forced to interview Cruz for the position of deputy superintendent, even though he was not on the list of approved candidates for the position.  [*Id.* p. 52]  The interviews for the position were conducted by a panel of interviewers, not just Plaintiff.  On the day Cruz found out he was not selected for the position, approximately July 1st, he left work on sick leave; on that same day, Plaintiff's office was "trashed," with Plaintiff's computer, fax machine, and desk "all strewn around."  [*Id.* p. 54] Other than the suspicious timing, however, Plaintiff has no evidence that Cruz was the person who committed this act.  [*Id.* p. 57]

Following this eventful first month and a half on the job, nothing of consequence occurred for some time.  However, in February 2002 Plaintiff became aware that Cruz was, in Plaintiff's opinion, deliberately sabotaging the accreditation process.  [*Id.* p. 71]  He was doing this by claiming that tasks necessary for certification had already been performed, when in fact they had not been done.  [*Id.*]  Despite Cruz's efforts, Plaintiff was successful in restoring the accreditation that had been lost while Cruz was interim superintendent.  [*Id.* p. 72]

At the end of February 2002, Plaintiff was told by her superiors to allow an investigative television reporter onto the School grounds to try to interview Cruz for reasons unrelated to Cruz' employment at the School.  [*Id.* p. 78]  Cruz was running for mayor of Springer at the time, and was "livid" about the reporter being on the premises.  Cruz filed a grievance against Plaintiff for allowing the reporter on the property.  [*Id.* p. 80]  Shortly after this incident, on February 26th or 27th, an unknown male with a Hispanic accent called Plaintiff at her office and told her that Cruz had a "hit" out on her.  [*Id.*]  Plaintiff called Hannaman as well as the state police, and

Hannamann arranged to have a guard posted at Plaintiff's home, around the clock, for about six

days.  [*Id.* pp. 82-83]  The state police spoke to Cruz, who denied the allegation; there is no

evidence that an attempt was ever made on Plaintiff's life.[2]  [*Id.* p. 85]  A day or two after the

anonymous "death threat" phone call, however, Cruz came to the School while he was off duty,

wearing a T-shirt that said, "Kill them all.  Let God sort out the rest," and laughing about the

matter.[3]  [*Id.* p. 88]  After this incident Plaintiff talked to Hannamann about the possibility of

having psychological tests performed on Cruz, but Hannamann denied Plaintiff's request.  [*Id.* p.

90-91]

In May 2002, Plaintiff received a performance evaluation from Hannamann that Plaintiff

considered unfair and inaccurate.  Hannamann rated Plaintiff as either meeting expectations or

exceeding expectations in every category, but Plaintiff disagreed with each "meets expectations"

rating.  [Exh. 3, MSJ]  Plaintiff introduced no evidence indicating that this evaluation affected her

financially in any way.  Due to Plaintiff's disagreement with the evaluation, she filed a grievance

against Hannamann.  [Exh. 4, MSJ]  This grievance was unsuccessful.

Also in May 2002, Plaintiff held a staff meeting in which she admits she lost her temper.

She also used profanity, although she did not swear at any staff members.  [Exh. 1, MSJ, p. 92]

As a result, thirteen employees of the School complained, and CYFD investigated the matter and

a report was prepared.  [Exh. 2, MSJ]  On the basis of this incident as well as Plaintiff's response

---

[2]Again, this information about the conversation the police had with Cruz is hearsay, and
not admissible for the truth of the matter asserted.

[3]Plaintiff was not at the facility and did not see the T-shirt herself.  Therefore, the fact that
Cruz wore the T-shirt is hearsay and may not be considered for summary-judgment purposes.
However, Plaintiff's belief that Cruz wore the T-shirt is relevant to her state of mind.

to the employees' complaints, and another incident in which a number of residents of the School obtained access to medication, a letter of reprimand was issued to Plaintiff on July 24, 2002. [Exh. 10, MSJ]  In addition, Hannamann prepared a Corrective Action Plan ("CAP") to address Plaintiff's "interpersonal skills and work performance."  [Exh. 11, MSJ]  As part of this CAP, Plaintiff agreed to "participate in the mediation process with Danny Cruz and subsequently the entire administrative staff" with a mediator hired by CYFD.  [*Id.*]

Although Plaintiff had agreed to the mediation, she did not believe it should be required or could be required, under CYFD's policies.  She therefore filed a grievance protesting the letter of reprimand and the mediation requirement, and resisted when Hannamann attempted to force her to attend mediation.  [Exh. 12, MSJ]  In early August, 2002, Hannamann called Plaintiff at home, while Plaintiff was on sick leave, and demanded that she attend a mediation session; Plaintiff refused and filed another grievance against Hannamann.  [Exh. 14, MSJ]  Later that month Plaintiff filed two more grievances, both directed against Hannamann's attempts to force Plaintiff to participate in mediation with Cruz.  [Exhs. 15, 16, MSJ]  All of Plaintiff's grievances were denied by the Secretary of CYFD.  [Exhs. 13, 17, MSJ]  However, Plaintiff never attended a mediation session with Cruz.

At some point following the flurry of grievances in August, Plaintiff retained an attorney and filed a tort claims notice with the state.  [Exh. 2, Resp., p. 156]  In November 2002, Hannamann asked Plaintiff to attend a meeting with him, to discuss their working relationship and a proposal he wanted to make which, according to Hannamann, she would like.  [*Id.* pp. 155-56] Plaintiff was reluctant to attend without her attorney, because Hannamann would not tell her what the proposal was.  However, she did attend the meeting and was not happy because a third party

was present, who conducted what Plaintiff perceived as a mediation session to which Plaintiff had

not consented.  [Exh. 19, MSJ]  Plaintiff wrote a memorandum to her attorney about the session,

and sent a copy to Hannamann.  [*Id.*; Exh. 2, Resp., p. 155]

 In December 2002, several employees of the School again filed complaints with CYFD

concerning Plaintiff.  These complaints concerned Plaintiff's use of the phrase "Burrito Man"

when calling out to a certain Hispanic employee; Plaintiff's discussion of the possibility that an

employee was having an affair; Plaintiff's statement that the woman involved in the affair had filed

a lawsuit against Cruz; an allegation that Plaintiff had yelled at the deputy superintendent; and

allegations that Plaintiff showed favoritism toward a particular employee.  [Exh. 20, MSJ]

Plaintiff maintains that everyone referred to the employee as Burrito Man because he sold

breakfast burritos to employees on the side.  [Exh. 2, Resp., p. 157]  She also explained that the

"affair" discussion occurred because she thought a qualified applicant was being black-balled by

the interview committee because it was his ex-wife who was having the affair with a current

School employee.  [*Id.* pp. 159-60]

 While CYFD was investigating the allegations, in January 2003, Plaintiff began applying

for jobs in Florida.[4]  [Exh. 1, MSJ, p. 13]  Plaintiff's elderly mother lived in Florida, as well as

---

 [4]The evidence submitted by the parties is not clear as to why Plaintiff began applying for jobs in January.  When asked at her deposition, Plaintiff stated, "Mary-Dale Bolson was appointed the..." and then the rest of the sentence has not been provided to the Court.  [Exh. 1, MSJ, p. 13] Later, Plaintiff testified that a picture in the newspaper of Bolson, who was the new Secretary of CYFD, gave Plaintiff the impression that Bolson intended to have Plaintiff replaced as superintendent of the school, since the superintendent position appeared on a list located behind Bolson.  [Exh. 2, Resp., pp. 166-69]  Unfortunately, Plaintiff has not provided the Court with any comprehensible evidence explaining why this list might have anything to do with Bolson's intentions regarding the superintendent position.  Furthermore, the Bolson picture appears to have become an issue in February, not January.  [*Id.*]

Plaintiff's sister, who had a terminal illness. [*Id.* p. 8]  Nothing resulted from the allegations until a new administration came into office, and a permanent director of the Juvenile Justice Division (Defendant Barreras) replaced Hannamann as Plaintiff's supervisor. On February 6, 2003, Barreras issued a notice of contemplated action, notifying Plaintiff that CYFD proposed to suspend her for ten days without pay. [Exh. 21, MSJ]  At almost the same time, Plaintiff asked for permission to take "FMLA"[5] leave to visit her sister. [Exh. 2, Resp., p. 165]  This request was denied, because the sister "was not considered close enough family, to be eligible for that."[6] [*Id.*]  Plaintiff then asked for annual leave, but Barreras denied the request, saying Plaintiff could accept the proposed suspension and use that time to visit her sister. [*Id.*]  Plaintiff then decided to use sick leave, and did go to Florida. [*Id.*, p. 166]  While Plaintiff was visiting her sister she also interviewed for positions in Florida. [*Id.*]

Before leaving New Mexico, Plaintiff had filed a response to the notice of contemplated action, providing an explanation for each of the assertions made in the notice. [Exh. 23, MSJ]  It is Plaintiff's belief that CYFD pre-judged the matter, and was determined to impose a suspension no matter what Plaintiff said.[7]  [Exh. 2, Resp., p. 170]  On March 3, 2003, while Plaintiff was in Florida, Barreras issued a notice of final action. [Exh. 24, MSJ]  This final action suspended

---

[5]Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.*

[6]Under the FMLA, an employee may take leave to care for a spouse, son, daughter, or parent.  29 U.S.C. § 2612(a)(1)(C).

[7]Plaintiff's evidence on this matter is double hearsay, and there is not enough information to allow the Court to determine whether any exception to the hearsay rule applies.  The Court therefore can consider the evidence only as it impacts Plaintiff's state of mind; the Court cannot accept as true the assertion that the proceeding was pre-judged.  *Cf. More v. Kuka Welding Systems*, 171 F.3d 1073, 1081 (6th Cir. 1999) (admission of double-hearsay statements is acceptable if each level of hearsay satisfies an exception to the hearsay rule).

Plaintiff for eight days rather than ten, after taking into account her explanations for some of the issues discussed in the notice of contemplated action.  Upon returning from Florida on March 10 or 11, Plaintiff submitted a letter of resignation to CYFD, maintaining she had been constructively discharged.  [Exh. 25, MSJ]  At the time she resigned, Plaintiff knew she had been offered a position with the State of Florida.  [Exh. 1, MSJ, p. 10]

**Claims Abandoned During Briefing:**  Plaintiff's complaint contains thirteen counts, including federal claims as well as state-law claims.  Defendants moved for summary judgment on all counts.  In response, Plaintiff has briefed only three federal claims:  (1) a due-process claim, alleging constructive discharge from her government position; (2) an equal-protection claim, alleging she was constructively discharged due to her gender and race; and (3) a Title VII claim, again alleging she was constructively discharged on the basis of her gender and race.  The Court therefore finds that Plaintiff has abandoned all other claims raised in the complaint, and on that basis will grant summary judgment as to those claims.  *See, e.g., Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 2003) (plaintiff failed to address state-law negligence claim in his district-court brief opposing summary judgment; the negligence claim is therefore deemed abandoned); *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir.2001) (race discrimination claim was abandoned where argument concerning that claim was not presented in initial response to motion for summary judgment).

**Due Process Claim:**  Plaintiff maintains she had a property interest in her position as superintendent of the School, and was deprived of that property interest without due process of law because she suffered a constructive discharge from that position.  Defendants do not challenge Plaintiff's claim to a protected interest in her job, and the Court therefore accepts the

proposition that her entitlement to remain superintendent was protected by the due process requirements of the Constitution. *See Yearous v. Niobrara County Memorial Hosp.*, 128 F.3d 1351, 1355-56 (10th Cir. 1997) (constructive discharge of an employee who has a protected property interest in her position may be actionable under § 1983 as a violation of due process).

When a government employee resigns, as did Plaintiff here, rather than being discharged, the employee can establish a violation of due process only if the employee was constructively discharged. *Id.* In determining whether a jury question exists as to the voluntariness of Plaintiff's resignation, the Court must consider the totality of the circumstances under an objective standard. *Id.* Plaintiff's subjective views of the situation are irrelevant. *Id.* A constructive discharge occurs only if a reasonable person in Plaintiff's position would have viewed the working conditions as intolerable, so that a reasonable person would feel compelled to resign. *Id.* Plaintiff must show that she had no other choice but to quit; it is not sufficient to show that the working conditions were difficult or unpleasant. *Id.*

It is important to determine the proper Defendants for purposes of this 42 U.S.C. § 1983 claim. Plaintiff's institutional employer, CYFD, is not a "person" under § 1983 and cannot be found liable under that statute. *See Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002). However, Plaintiff's supervisors, who had control over her working conditions, are proper defendants with respect to Plaintiff's due-process claim. *See Sutton v. Utah State Sch. for the Deaf and Blind*, 173 F.3d 1226, 1237 (10th Cir. 1999) (while neither state, nor state employee sued in official capacity, may be liable for monetary damages under § 1983, employee may be liable in individual capacity); *Woodward v. City of Worland*, 977 F.2d 1392, 1402-03 (1992) (holding by implication that supervisors or others with power to discharge employee could be

9

liable for constructive discharge in violation of right to due process).  The two supervisors named as Defendants in this case are Hannamann and Barreras; Cruz, who was a subordinate employee, cannot be held liable for constructively discharging Plaintiff.  *Woodward*.

Having determined the proper Defendants, the Court must examine the evidence to determine whether a reasonable jury could find that either Hannamann or Barreras constructively discharged Plaintiff.  In doing so, the Court may not attribute to either Defendant all of the alleged wrongs suffered by Plaintiff while she was employed at the School, as Plaintiff in effect argues.  Instead, since the § 1983 liability at issue in this claim is individual liability, Hannamann and Barreras are responsible only for the actions each took with respect to Plaintiff's working conditions.[8]  *See Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997) (individual liability under § 1983 is based only on personal involvement in the constitutional violation); *Jenkins v. Wood*, 81 F.3d 988, 994-95 (10th Cir. 1996) (defendant must personally participate in the alleged constitutional violation).  The Court must therefore examine the evidence introduced against Hannamann and Barreras separately.

As to Hannamann, who supervised Plaintiff for the bulk of the time she was employed at the School, there is one glaring difficulty for Plaintiff to overcome--she did not resign while Hannamann supervised her, or even at a time close to any action Hannamann took with respect to Plaintiff's employment.  Plaintiff has a number of complaints about Hannamann's supervision,

---

[8]The situation might be different if there was any evidence of a conspiracy between Barreras and Hannamann, to force Plaintiff out of her job without affording her due process.  No such evidence has been presented.  As far as the Court can determine from the record, Barreras simply succeeded Hannamann, who had been acting director of the juvenile justice division. Plaintiff has produced no evidence the two Defendants had any discussions concerning Plaintiff or any other topic related to this case.

including his failure to support her adequately against the misbehavior of Cruz, his unfair and

inaccurate evaluation of her performance, his failure to warn her about Cruz and his clique before

she took the job at the School, his failure to tell her about the requirement that she supervise three

other facilities in addition to the School, his refusal to require that Cruz obtain counseling

following the kill-them-all T-shirt incident, his letter of reprimand and corrective action plan, and

especially his efforts to force her to participate in mediation with both Cruz and Hannamann even

though she did not want to and believed forced mediation was contrary to CYFD policy.  The

bottom line, however, is that Plaintiff did not resign after any of these incidents.  Obviously,

therefore, she did not feel as if she had no choice but to resign.

The last encounter Plaintiff had with Hannamann, at least according to the evidence

presented to the Court, was in early November of 2002.  Plaintiff did not resign until March 2003,

four months later.  The Court therefore determines that no reasonable jury could find that

Hannamann's actions forced Plaintiff to resign and rendered her resignation involuntary.  *See,

e.g., McPherson v. City of Waukegan*, 379 F.3d 430, 440 (7th Cir. 2004) (employee was not

constructively discharged where she resigned months after hostile work environment had ended as

a result of the harasser's resignation); *Mosher v. Dollar Tree Stores, Inc.*, 240 F.3d 662, 667 (7th

Cir. 2001) (employee could not complain that events occurring four months prior to her

resignation were the triggering events that made it impossible for her to remain an employee).[9]

---

[9]Aside from the delay between Hannamann's last negative contact with Plaintiff and
Plaintiff's resignation, the Court also finds that Hannamann's actions did not rise to the level of a
constructive discharge.  His actions and his lack of support in her power struggle with Cruz made
the workplace difficult for Plaintiff but did not leave her with no choice but to resign.

11

As to Barreras, the following actions are attributable to him: he refused to grant FMLA leave or annual leave to Plaintiff, to allow her to visit her ill sister; he instead attempted to coerce her into accepting a suspension, by saying she could use the suspension period to visit her sister; he signed a notice of contemplated action proposing to suspend her; and he signed the notice of final action suspending Plaintiff for eight days. These actions do not rise to the level of a constructive discharge. Plaintiff was not eligible for FMLA leave under the statute or the applicable regulation and was able to take sick leave to visit her sister. N.M. Administrative Code, § 1.7.7.12; 29 U.S.C. § 2612. Therefore, Plaintiff was not forced to choose between resigning or losing the opportunity to visit her dying sister. Furthermore, Plaintiff's suspension resulted from a complaint filed against her by a number of subordinate employees, which was investigated by CYFD. Even if the suspension was unfair, an employer does not constructively discharge an employee by imposing a short period of suspension following a full investigation, especially where, as here, the employee has an administrative procedure available to attempt to reverse the suspension.[10]  *See Tatom v. Georgia-Pacific Corp.*, 228 F.3d 926, 932 (8th Cir. 2000) (120-day suspension was not sufficient to support jury's finding of constructive discharge); *Stembridge v. City of New York*, 88 F.Supp.2d 276, 283-84 (S.D.N.Y. 2000) (six-day suspension was not constructive discharge where administrative review process was available to employee); N.M.A.C. § 1.7.11.13 (setting out review process for disciplinary actions taken against employees of State of New Mexico). Plaintiff simply resigned, knowing she had a job waiting in Florida,

---

[10]The situation might be different if the suspension resulted in such financial hardship that the employee was forced to seek employment elsewhere to support her family. No evidence to that effect has been presented to the Court. In fact, it is not even clear if the suspension was with pay or without pay.

without completing the procedure that was available to her to challenge the suspension.  Summary
judgment will be granted to Barreras on Plaintiff's due-process claim.

**Equal Protection Claim:**  Plaintiff argues this claim as a "class of one" equal-protection
claim, citing *Esmail v. Macrane*, 53 F.3d 176, 178-9 (7th Cir. 1995).  This type of claim requires
evidence that Plaintiff was "singled out for persecution due to some animosity on the part of"
either Hannamann or Barreras.[11]  *Bartell v. Aurora Public Schs.*, 263 F.3d 1143, 1149 (10th Cir.
2001).  Plaintiff must show that either or both of these Defendants acted out of a spiteful attempt
to "get" Plaintiff for reasons wholly unrelated to any legitimate state objective.  *Id.*  Again, the
evidence as to each individual Defendant must be examined separately.

As to Defendant Hannamann, Plaintiff's evidence is insufficient to state an equal-
protection claim under the class-of-one theory for two reasons.  First, Hannamann's actions
cannot be the basis of a class-of-one claim because, even viewing them in the light most favorable
to Plaintiff, they are not so devoid of a rational basis as to allow a conclusion that they indicate
the type of malice or ill-will required to state a class-of-one claim.  The Tenth Circuit recently
recognized that class-of-one claims must be "carefully circumscribed" to avoid providing a federal
cause of action for review of almost every decision made by state actors.  *Jennings v. City of
Stillwater*, ___ F.3d ___ (10th Cir. 2004).  Only the most clear acts of arbitrary persecution will
satisfy this standard.  *Cf. id.*  Hannamann's evaluation of Plaintiff's performance, while not giving

_____

[11]As with the due-process claim, the only proper defendants for this claim are the
individual supervisors who had control over Plaintiff's work performance.  CYFD is not a proper
party to a § 1983 action, and Cruz had no authority to discipline Plaintiff.  *See Apgar v. State of
Wyoming*, 2000 WL 1059444 (10th Cir. unpublished) (citing 10th Circuit cases for the
proposition that in order to establish the state action necessary to hold an individual defendant
liable for a constitutional violation, that defendant must have been the plaintiff's supervisor or in
some other way exercised state authority over her).

Plaintiff the perfect ratings she felt she deserved, was a good evaluation overall.  Also, the letter

of reprimand and corrective action plan was based on an incident everyone agrees did occur;

Plaintiff's defense was not that the incident was a fabrication, but that she is not the only

employee or supervisor who uses profanity at the School.  In addition, Hannamann did not ignore

the death-threat incident; he provided 24-hour security guards for Plaintiff's home for a period of

time.  Finally, Hannamann's efforts to force Plaintiff to attend mediation sessions with him and

with Cruz, even if they violated CYFD policy and were completely misguided, cannot be

considered so irrational and arbitrary as to constitute evidence of the level of malice or ill will

required in class-of-one cases such as this.  To consider Plaintiff's claim this Court will be forced

to become a super personnel department, reviewing all decisions made by supervisors that the

employee considers to be baseless, unfair, and arbitrary.  *Cf.  Simms v. Okla. ex rel. Dep't of

Mental Health & Substance Abuse Servs*., 165 F.3d 1321, 1333 (10th Cir.1999) (noting, in Title

VII context, that courts will not perform such supervisory functions over employers' decisions).

      In addition, Plaintiff's class-of-one claim fails against Hannamann because Plaintiff has

failed to sufficiently identify a similarly-situated School employee who was treated differently.

Again, the *Jennings* case is instructive.  In *Jennings* the Tenth Circuit held that, especially in

class-of-one cases, the similarly-situated-individual requirement should be strictly applied.  In this

case, Plaintiff has attempted to argue that Cruz is the similarly-situated individual who was treated

differently, because he was afforded favoritism he did not deserve and escaped punishment he did

deserve, while Plaintiff was punished unfairly.  Cruz, however, was not the superintendent of the

School.  Furthermore, as far as the Court is aware Cruz did not have any written complaints

lodged against him by other employees, such as the complaints filed against Plaintiff following the

May 2002 staff meeting.  Cruz therefore cannot be considered to be similarly situated with respect to the actions taken against Plaintiff by Hannamann.  To the extent Plaintiff argues that she was not the only employee who used profanity, and that she was unfairly reprimanded for doing so in the staff meeting, she also fails to sufficiently specify a similarly-situated individual or group of individuals.  She has not identified any supervisor who lost his or her temper at a staff meeting, used profanity in the context of losing her temper, and was subjected to formal complaints as a result.

As to Defendant Barreras, the result is the same.  Barreras' suspension of Plaintiff for eight days was based on the prior letter of reprimand as well as complaints brought against Plaintiff by several subordinate employees, and followed a full investigation by CYFD.  The Court will not second-guess the investigation and find that Barreras' decision was so lacking in rational basis that it was malicious or completely arbitrary.  It is true that Barreras also denied Plaintiff permission to take FMLA leave or annual leave to visit her sister, who was very ill.  However, Plaintiff was not legally entitled to take FMLA leave.  Furthermore, Plaintiff has not argued she was entitled to take annual leave, or had sufficient hours of such leave to cover her period of absence.  Finally, Plaintiff was allowed to take sick leave and was able to visit her sister.  The Court finds as a matter of law that forcing an employee to take sick leave, when such leave is appropriate and available, is not the type of behavior that will subject a supervisor to a class-of-one equal-protection claim.

In addition, the same lack of a similarly-situated individual dooms Plaintiff's class-of-one claim against Barreras, as it did the claim against Hannamann.  Again, no one else was the superintendent of the School, and no one else was subjected to the type of formal complaints that

15

were filed against Plaintiff, investigated by CYFD, and led to the suspension.  No one else,

therefore, was similarly situated to Plaintiff for purposes of a class-of-one claim.

   **Title VII Claim for Gender and Race Discrimination:**  The proper Defendant for this

claim is CYFD, as individual supervisors are not liable in the Tenth Circuit for violations of Title

VII, 42 U.S.C. § § 2000e *et seq.  Sauers v. Salt Lake County,* 1 F.3d 1122, 1125 (10th Cir.1993).

Under Title VII, a claim of unlawful discrimination can be proven through either direct or

circumstantial evidence.  *Kendrick v. Penske Transp. Services, Inc.,* 220 F.3d 1220, 1225 (10th

Cir.2000) (citing *Shorter v. ICG Holdings, Inc.*  188 F.3d 1204, 1207 (10th Cir.1999) and

*Elmore v. Capstan, Inc.,* 58 F.3d 525, 529 (10th Cir.1995)).  Such a claim can survive summary

judgment only where the plaintiff has presented sufficient evidence to show there is a genuine

issue of material fact pertaining to whether the plaintiff's gender or race actually motivated the

allegedly discriminatory conduct. *Reeves v. Sanderson Plumbing Products, Inc*., 530 U.S. 133,

141 (2000); Fed.R.Civ.P. 56(c).

   Plaintiff first argues there was direct evidence of discrimination in this case, and provides

two examples:  (1) Hannamann taught Plaintiff Spanish profanity so she could better acclimate

into the Hispanic culture at the School; and (2) Hispanic employees of the School were allowed to

call one employee "Burrito Man," but Plaintiff was suspended at least in part for using that term.

As to the first item, no reasonable jury could find that teaching Plaintiff profane words in Spanish

was an act of discrimination against her as a woman or as a non-Hispanic.  Helping her to

understand what her employees and students are saying, or to fit in more easily into the

environment, is helpful rather than harmful.  Furthermore, there is no evidence that Hannamann's

act of teaching her the Spanish profanity was connected at all to the adverse employment actions

later taken against Plaintiff.  Such a causal connection is required to consider evidence to be direct evidence of discrimination for purposes of Title VII.  *See Putman v. Unity Health Sys.*, 348 F.3d 732, 735 (8th Cir. 2003) (direct evidence is evidence that establishes a specific link between the alleged discriminatory animus and the challenged decision);  *Weberg v. Franks*, 229 F.3d 514, 522 (6th Cir.2000) (direct evidence requires the conclusion that the employer's actions were motivated, at least in part, by unlawful discrimination).

As for Plaintiff's second example of direct discrimination, there is no evidence that the person making the suspension decision, Barreras, knew that Hispanic employees of the School called the individual in question "Burrito Man."   The investigative report compiled for Barreras contains no information to that effect.  [Exh. 20, MSJ]  Plaintiff, in her rebuttal to the notice of contemplated action, did not defend her actions on that basis; instead, she stated she did not remember using that phrase and added that if she did, it must have been related to the employee's side business selling burritos to other staff members.  [Exh. 23, MSJ]  Since there is no evidence Barreras failed to punish Hispanic employees who used the phrase, there is no evidentiary basis for Plaintiff's contention that punishing her for using the phrase is direct evidence of discrimination by Barreras.

In the absence of direct evidence of discrimination, the burden-shifting framework established in *McDonnell Douglas Corp. v. Green.*  411 U.S. 792, 802-05 (1973) must be applied to determine whether summary judgment is appropriate.  The *McDonnell Douglas* framework comprises three burden-shifting steps. Initially, the burden rests with the plaintiff to establish a prima facie case of gender or race discrimination.  *Id.* at 802. If the plaintiff has established a prima facie case, the burden then shifts to the defendant to "articulate some legitimate,

17

nondiscriminatory reason" for its action. *Id.* Finally, if the defendant articulates a

nondiscriminatory reason, the burden shifts back to the plaintiff to show the proffered reason is

merely a pretext for racial discrimination. *Id.* at 804. Where the parties have satisfied their

respective burdens under the *McDonnell Douglas* framework, summary judgment is ordinarily

inappropriate. *Reeves,* 530 U.S. at 148.

      The first step in the analysis, therefore, is to determine whether Plaintiff has established a

prima facie case of gender or race discrimination. To do so in the context of a disparate-

treatment claim such as this one, Plaintiff must present evidence of the following: (1) she is a

member of a racial minority or protected group, (2) she suffered an adverse employment action,

and (3) similarly situated employees were treated differently. *See Trujillo v. University of Colo.*

*Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir.1998) (modifying the usual McDonnell

Douglas prima facie case to fit the context of a disparate treatment claim). There is no dispute

that Plaintiff, as a woman, is a member of a protected group; however, as a non-minority she must

raise her race discrimination claim as an issue of reverse discrimination. Different standards apply

to a reverse discrimination claim, and the Court will therefore examine the gender discrimination

and race discrimination claims separately. *See Reynolds v. School Dist. No. 1*, 69 F.3d 1523,

1534 (10th Cir.1995) (member of majority may show reverse discrimination by identifying

background circumstances that show the defendant is one of those unusual employers who

discriminate against the majority); *Notari v. Denver Water Dept.*, 971 F.2d 585, 590 (10th

Cir.1992) (alternatively, a reverse discrimination plaintiff may satisfy the first prong of *McDonnell*

*Douglas* by presenting indirect evidence sufficient to support a reasonable probability that, but for

the plaintiff's status, the challenged employment decision would have favored the plaintiff).

18

As to the gender-discrimination claim, the next step is to determine whether Plaintiff suffered an adverse employment action.  It is clear that she did; the letter of reprimand issued by Hannamann formed part of the basis of Plaintiff's subsequent suspension, and the Court will consider both the reprimand as well as the suspension to be adverse employment actions as that term is understood for purposes of Title VII.  *See, e.g., Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir.1998) (oral reprimands are not included within the definition of adverse employment action *unless* there is evidence that they had some impact on the employee's employment status).  Plaintiff also argues that she was constructively discharged, and this should be considered an adverse employment action.  For the reasons discussed in the preceding sections, however, the Court finds as a matter of law that no reasonable jury could determine objectively that Plaintiff's working conditions were so intolerable that she had no choice but to resign at the time she did.  The Court therefore finds no constructive discharge occurred for purposes of the Title VII claim.[12]

The final step of the prima-facie-case analysis is deciding whether Plaintiff has presented any evidence that similarly-situated employees were treated differently than she was.  This is where Plaintiff's discrimination claim falters.  Plaintiff argues that Cruz was a similarly-situated employee, and that he was treated favorably in many ways, including the following:  (1) failure to require him to attend counseling for the kill-them-all T-shirt incident; (2) failure to discipline him

---

[12]It should be noted that Plaintiff submitted no admissible evidence supporting her belief that she was targeted for removal as superintendent.  If she had provided evidence other than her double-hearsay assertion that her grievance of the suspension was pre-decided, and her conjecture that the new Secretary of CYFD was intent on replacing her, a fact question would exist as to the constructive discharge.  This is so because an employee who is given a choice between resigning or being fired has been constructively discharged.

for trashing Plaintiff's office or for sabotaging the accreditation process; (3) allowing him to run for mayor of Springer, allegedly in violation of New Mexico law; and (4) interviewing him for the position of deputy superintendent, even though he was not qualified for the position.  The problem with Plaintiff's argument is that, contrary to Plaintiff's contention, Cruz was not similarly situated with Plaintiff.

A "similarly situated" employee, in a case such as this involving the imposition of discipline in a discriminatory manner, is an employee who deals with the same supervisor, is subject to the same standards governing discipline, and violated work rules of comparable seriousness.  *Kendrick v Penske Transp. Svs., Inc.*, 220 F.3d 1220, 1232 (10th Cir. 2000); *Aramburu v. The Boeing Co.*, 112 F.3d 1398, 1404 (10th Cir. 1997).  In other words, it is not sufficient that both Cruz and Plaintiff worked at the School and were employed by CYFD.  Plaintiff was the superintendent, and presumably therefore supervised Cruz, while Plaintiff was supervised by Hannamann.  As superintendent, Plaintiff could reasonably be held to higher standards of conduct than subordinate employees.  Plaintiff was twice subjected to formal complaints filed by a number of employees, which were then investigated by CYFD; there is no evidence in the record indicating that any formal complaint was ever filed against Cruz.  For all these reasons, the Court finds Cruz was not similarly situated  to Plaintiff for purposes of

Plaintiff's gender discrimination claim.[13]  For this reason, summary judgment will be granted on that claim.

The result is the same with respect to the race discrimination claim.  As pointed out above, to satisfy the first prong of the *McDonnell Douglas* test, a reverse-discrimination plaintiff must introduce evidence of background circumstances that show the defendant is one of those unusual employers who discriminate against the majority, or must present indirect evidence sufficient to support a reasonable probability that, but for the plaintiff's status, the challenged employment decision would have favored the plaintiff.  In other words, Plaintiff was required to introduce evidence tending to show that if she had been Hispanic, she would not have received the letter of reprimand and would not have been suspended.  There is no such evidence in the record.

The easiest way for Plaintiff to have met her burden would be to show that Hispanic employees were formally charged with rules violations similar to hers, and received less punishment.  For the reasons discussed above, the Court finds Plaintiff has not done so.  Also for the reasons discussed above, it was not sufficient for Plaintiff to introduce evidence that one Hispanic employee, Cruz, was shown favoritism in ways unrelated to the matters for which

---

[13]In addition, it is not sufficient for Plaintiff to point to instances in which Cruz was shown favoritism, such as the unwarranted interview for a position or allowing him to run for office.  To raise an inference of discrimination, the more favorable treatment accorded a fellow employee must be in the arena of the imposition of discipline--the fellow employee must have violated rules of comparable seriousness, and escaped punishment.  In this case, it was incumbent on Plaintiff to provide actual, admissible evidence, other than mere hearsay or conjecture, that Cruz threatened Plaintiff's life, or trashed her office, or was sabotaging the accreditation process, to show that he violated rules of comparable seriousness.  Of course, there would also have to be evidence that either Hannamann or Barreras, the supervisors who disciplined Plaintiff, had an opportunity to discipline Cruz as well but failed to do so.  If no formal complaints were filed against Cruz initiating the disciplinary process, it cannot be said that Cruz was treated more favorably than Plaintiff in the disciplinary arena.

Plaintiff was disciplined.  The Court therefore finds that Plaintiff has failed to make a prima facie showing of either race or gender discrimination, insofar as the discipline imposed on her is concerned.[14]

**Conclusion:**  Plaintiff introduced ample evidence that she was placed in a poisonous work atmosphere, including power struggles between various cliques and a requirement that she supervise an employee who was bitter about not being appointed the permanent superintendent after having held the position of acting superintendent.  She also introduced evidence of a complete lack of support from her supervisors when employees complained about her behavior.  However, a difficult work environment is not actionable as a federal claim unless actions are taken based on an employee's race or gender, or on the basis of malicious prejudice against that individual.  Plaintiff's evidence, even viewed in the light most favorable to her claims, was not sufficient to survive summary judgment on her constitutional claims or her Title VII claims.  Therefore, summary judgment will be granted to Defendants.

**DATED** at Albuquerque this 5th day of October, 2004.


BRUCE D. BLACK
United States District Judge

---

[14]If the Court had found that the prima-facie-showing requirement had been met, summary judgment would still have been granted on the Title VII claims.  Defendants' justifications for the letter of reprimand and the suspension were the numerous complaints received from employees concerning Plaintiff's behavior at the May 2002 staff meeting and at other times.  The letter of reprimand and the suspension were issued following full investigations by CYFD, with interviews of various witnesses.  Plaintiff has presented no evidence tending to show that the results of these investigations were a mere pretext for discrimination.

**Attorneys:**

**For Plaintiff**
Gilbert J. Vigil

**For Defendants**
John B. Pound